58 CCPA
**Application of John Charles CAVANAGH.**

**Patent Appeal No. 8414.**

United States Court of Customs and Patent Appeals.

Jan. 28, 1971.

Linton & Linton, Washington, D. C., attorneys of record, for appellant. Ulle C. Linton, Washington, D. C., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Lutrelle F. Parker, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and NEWMAN, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal[1] is from the decision of the Patent Office Board of Appeals insofar as it affirmed the rejection of claims 1, 2, 4, 5, 21, and 22 in appellant's reissue application serial No. 371,862, filed April 20, 1964, for a "Process for the Production of Protein Enriched Material From Protein-Containing Materials Having a Relatively High Water Content." We affirm.

1. The Petition of Appeal, taken, perhaps, from some old form book, states that this appeal is "pursuant to sections 4912 and 4913, Revised Statutes, United States," which were repealed over eighteen years ago. However, we have construed it as if filed pursuant to 35 U.S.C. § 141, the present statute.

## THE INVENTION

The claimed process is for producing a protein-enriched product from water- and protein-containing materials of animal origin, such as waste from abattoirs, fish-processing plants, and whaling stations. Claim 21, which is new to the reissue application, reads as follows, with subparagraphing and emphasis supplied:

> 21. A process for producing a protein enriched product from a protein-aceous materials [sic] of animal origin having a water content of at least 20% consisting
>
>> *in introducing* the proteinaceous materials of animal origin into a flow of at least one organic solvent capable of mixing with water and of dissolving fat and having a boiling point below that of water moving in a counter direction to said material,
>>
>> *in agitating* said material in the presence of said solvents and
>>
>> *in pressing* the liquids therefrom in successive stages,
>
> the fresh solvent being introduced to said material at the final one of said stages when the fat and water content [2] are least,
>
> the liquids from the aforementioned stages including dissolved fat, flowing onto oncoming new material in the first of said stages where the fresh material is introduced and from which stage all liquid is drained from the process,
>
> the temperature of the material and liquid in said first stage being elevated to the point of rendering the fat in said material,
>
> the volume of solvent admitted to the process in said final stage being regulated so that the solvent of the liquid encountering the new material in said first stage will combine with the water available from said material

while substantially failing to combine with the rendered fat and substantially separating from the fat of other stages, the liquid drained from said first stage thus separating into two phases, one of which contains substantially all of the water [3] and the other substantially all of the fat.

The output of the process is dehydrated, fat-free, protein-containing material at one end and a liquor comprising melted fat, water, and solvent at the other. The regulation described in the final subparagraph is designed to insure that the fat is present in the outgoing liquor as a phase separate from the water-solution. If too high a percentage of solvent is present in the outgoing liquor, the fat will go into solution. The apparent purpose of the regulation is to facilitate subsequent separation of the three principal components of the outgoing liquor.

Claim 1 contains the additional step of "reducing the water content of the proteinaceous materials of animal origin to below 60%," which step is carried out before the other three steps. Claim 4 contains no such additional step, but does specify that the process input has "a water content of at least 20% and below 60%." Claim 2, which depends from claim 1, and claim 5, which depends from claim 4, both specify that the solvent used in the process set forth in the claim from which each depends is acetone. Claim 22 is independent, but the only difference between it and claim 21 which is relevant here is that it, too, specifies that the solvent used in the claimed process is acetone.

The claims differ from one another in additional minor respects not relevant to this appeal. However, they all set forth a countercurrent process operating upon proteinaceous materials of animal origin initially having a water content of at least 20%. The significance of the 20%-

---

2. I. e., the fat and water content *of the material.*

3. And, it follows from what came before, substantially all of the solvent.

water-content limitation is apparent from the specification, which explains that:

> With protein-containing materials such as the waste from abattoirs, fish processing plants and whaling stations, one of the major difficulties in recovering the protein material in a dried form, and separating the fat or oil, is the high water content of the raw material. The object of the present invention is to provide an improved process for the production of a protein-enriched product from protein-containing materials having a relatively high water content, i. e. of the order of 20% or greater.

The significance of the recitation of countercurrent operation would seem to be in part the natural product of the process's ability to operate on water-containing input and in part an attempt to distinguish over the prior art. As the specification makes clear, protein-enriched material *can* be produced from protein- and water-containing material by a process similar to the claimed process except that the steps are kept separate, each employing its own liquid reactant (i. e., solvent or dehydrating agent).

### THE REFERENCES

The references relied on are:

| Societe Civile (British) | 727,072 | Mar 30, 1955 |
| Beeson | 2,512,710 | June 27, 1950 |
| Maurer et al. | 2,358,869 | Sept. 26, 1944 |

The British patent discloses a process for manufacturing powdered fish from fresh fish which is said to remove "certain oils and oxidisable fatty substances" from the subject proteinaceous materials of animal origin. The extraction process consists essentially of two steps which are *"preferably* carried out in successive stages separated by drying operations."

(Emphasis ours.) A third, preparatory step is added "In practice," for it is disclosed that it *"may* be of advantage" (emphasis ours) to dehydrate the fish "in one or more operations separated by drying operations" before extraction is commenced. This preparatory stage, which is said to "dehydrate the pulp [i. e., the fish input, which is apparently pulped even before this stage], but with an *insufficient* extraction of the lipins"[4] (emphasis ours), consists of mixing the fish with their own weight in acetone and kneading the mixture for 45 minutes at a temperature of 50°C. At the conclusion of this step, the resulting liquor is drawn off and the subject material is dried "as thoroughly as possible." In the second step (the first designed primarily to extract fats), the dehydrated pulp is mixed with its own weight of 90% (by weight) ethyl alcohol, kneading is resumed, and the mixture is boiled for "about 45 minutes," which is said to result in the complete disintegration of the fish tissues. The liquor (which must this time consist primarily of ethyl alcohol and dissolved fats) is again drawn off "until complete drying of the [completely disintegrated] tissues is achieved." In the third step, the subject material is mixed with "a quantity of 90% (by weight) ethyl alcohol equal to half the original volume of fish," and kneading and boiling are repeated "for about half an hour" before "The liquid phase is * * * [again] drained off and the solid material * * * dried as previously." The product is said to be "entirely dehydrated and freed of lipins." It is additionally relevant to the use of this disclosure as a reference that it states that "The drained off liquid phases appear in emulsified form" and that:

> It is of advantage not to distil the liquid phase resulting from the second

---

4. According to *Webster's New International Dictionary* (2d ed. 1954), the word "lipin" when used in biochemistry is the equivalent of the word "lipide," and according to Reinhold, *The Condensed Chemical Dictionary* (6th ed. 1961), "lipide" is "The form for lipid preferred by Chemical Abstracts" and "lipid" is:

> A term used to define fats and fat-

> like materials. It includes all substances which are: (1) relatively insoluble in water but are soluble in the fat solvents (benzene, chloroform, acetone, ether, etc.), (2) related either actually or potentially to fatty acid esters, and (3) utilizable by the animal organism.

stage but to use it as it is with the addition of fresh alcohol for the extraction of a further quantity of fresh fish. The liquid phase from the third and any following stages may be used as it is.

Beeson discloses a process and an apparatus for "the solvent extraction of fatty or oily substances from meat scraps, vegetable seed meals and other fat or oil bearing materials." The following drawing from his specification shows his apparatus and serves as a convenient reference in describing his process:

Fig. 1.

[A3546]

The proteinaceous materials are introduced into the baskets 33 at the bottom of each circuit and discharged at the top through hopper 18. The baskets have perforated or open mesh bottoms, and the solvent which is applied to the materials during their upward passage by means of the value-controlled spray pipes 23 drains from basket to basket in counter direction to the progress of the materials. According to the specification, "Any of the commonly used solvents, such as hexane, heptane, ethers, alcohols, etc. can be used" in practicing the invention, no constraints concerning miscibility or boiling point being disclosed. Vibrating devices 25 subject the passing baskets to "vibrating force, to thereby agitate the material in the basket." It is explained that this agitation "produces an unexpected, greatly increased rate of drainage of the solvent through the material and materially reduces the amount of solvent retained in the material." The reason this result is said to be unexpected is that "It would naturally be expected by skilled engineers and mechanics versed in the art of solvent extraction that to thus vibrate or agitate the material would tend to pack it or make it denser and reduce the drainage of solvent therethrough * * *."

Maurer et al. disclose a process for recovering extracts from animal organs by fractionation and refining, a byproduct of which is protein-containing material. Initially the animal organs are dehydrated, among other ways, "by means of * * * hydrophilic liquids, such as acetone, ethyl alcohol or propyl alcohol." The actual extraction is carried out "with an immiscible lipid solvent such as, for example, chloroform, ethylene dichloride, ligroin, or toluene."

## THE REJECTION

The examiner rejected all claims under 35 U.S.C. § 103 "as unpatentable over each of Beeson, Maurer et al. and the British patent." The board affirmed, focusing on the British patent but implicitly affirming the examiner's alternative rejections by reason of its failure to reverse them. (Rule 196(a), Rules of Practice in Patent Cases.) It noted that

the British patent "is clearly concerned with the production of a protein enriched product from materials of the same nature as appellant's raw materials" and that the ethyl alcohol called for by the reference satisfies the limitations placed on the solvent called for in appellant's claims 1, 4, and 21. As for the use of acetone, the board stated that the British patent and Mauer et al. disclose its use in dehydrating proteinaceous materials and that appellant had previously conceded that the use of acetone as a fat solvent was old. According to the board, the British patent suggests countercurrent extraction and Beeson explicitly teaches "this well known expedient." Finally, the board concluded that "The feature of the appealed claims relating to the two phases of the outgoing liquor finds response in the disclosure in the British patent to the effect that 'The drained off liquid phases appear in emulsified form'."

## APPELLANT'S ARGUMENTS

Appellant argues that the British patent discloses a process consisting of distinct operations, between which the work material is completely dried, in contrast to appellant's continuous, countercurrent operation resulting in simultaneous defatting and dehydration. As for the references to acetone in the British patent and in Maurer et al., appellant dismisses both as teaching the use of acetone only to dehydrate, not to remove fat. Appellant then dismisses Beeson's disclosure as inoperable, relying on a lengthy affidavit reciting the unsatisfactory results of various attempts to employ Beeson's process. Finally, appellant notes the longstanding need in the underdeveloped countries of the world for commercially exploitable processes for producing protein-containing materials "which can be economically produced and will not require special preservatives or refrigeration in the storage, shipment or marketing thereof" and asks why, if what he did was so obvious, that long-felt need had not been fulfilled "before the present applicant arrived on the scene."

## OPINION

We agree with the board that

\* \* \* the British patent is most pertinent to the claimed process, and [that] the modification thereof to meet the terms of the appealed claims would be obvious to the person of ordinary skill in this art from knowledge of the other two references.

While we agree with appellant that the British patent and Maurer teach the use of acetone *to dehydrate* proteinaceous materials of animal origin and do not teach the use of acetone *as a fat solvent*, we note that, in a letter to the Commissioner of Patents which requested that its contents be considered together with a previously made Request for Reconsideration of the board's decision in this case, appellant conceded that "To replace the ethanol of the British patent [used in the defatting stages] by acetone might be admitted as an obvious step," and in any event we think the use of acetone as a fat solvent is so well known as to be a fit subject for the taking of judicial notice. See, e. g., the reference to "the fat solvents," including acetone, in the definition of "lipid," footnote 4, supra. Even appellant's disclosure that acetone may be used to remove both water and fat from a given proteinaceous material simultaneously is not new, for, as we noted previously, the British patent states that the preparatory step of kneading the pulped fish with acetone results in dehydration, "but with an *insufficient* extraction of the lipins" (emphasis ours), thus clearly implying a recognition that *some* extraction of the lipins takes place simultaneously with the dehydration.

Similarly, while we agree with appellant that it indicates a preference for complete dehydration between process steps, we note that the British patent prefaces its recitation of the process as it is carried out "In practice" with the statement that "Extraction is *preferably* carried out in successive stages separated by drying operations" (emphasis ours), clearly implying that the process may

be carried out without separating at least the two extraction stages by dehydration. Although we do not find in the British patent any suggestion that the process there disclosed can be carried out employing countercurrent extraction, we do agree with the board that there was "nothing unobvious in * * * [appellant's] adoption of this common technique." In any event, countercurrent extraction of facts under closely analogous circumstances is clearly taught by the Beeson reference.[6]

In summary: Having concluded that it was known prior to appellant's invention both that fat could be extracted by a countercurrent operation and that acetone would function both as a defatter and as a dehydrant, we see nothing unobvious in using acetone in a countercurrent operation both to dehydrate and to extract fat, and, of course, if appellant's narrow claims are obvious in view of the prior art, so are his broad claims.

■ There remain for brief consideration appellant's Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), arguments. Essentially these fail because they *are* only arguments, unsupported by evidence. Appellant's brief implies that his invention has satisfied a long and deeply felt need which had not previously been satisfied though "many organizations have spent considerable sums on research" to solve the same problems eventually solved by appellant. In this case, even if we accept that there was a problem, it was still incumbent upon appellant, if he wished by this method to rebut the inference of obviousness arising from the similarity of his process to the prior art, to bring

forward evidence of his satisfaction of the need. This he did not do.

The decision of the board is affirmed.

Affirmed.

---

6. We accept appellant's Rule 132 affidavit as establishing that Beeson's process, as disclosed, is inoperative to extract the fats from meat scraps of ordinary size. However, we think the reference is still available to supplement the British patent with its suggestion that fats may be extracted in general from "proteinaceous materials of animal origin" by means of a process in which fresh solvent is first applied to nearly fat-free materials at the end of the extraction process, the increasingly fat laden solvent then moving through the process in the direction opposite to that of the materials treated until the materials entering the extraction phase of the process are met with solvent containing fat extracted during all the subsequent stages of the process.